**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

**WISCONN INVESTMENTS, LLC, and**
**CHERRY POINT MALL, LLC**
        **Plaintiffs,**

**v.**                                                                                    **08-C-0223**

**WELLS FARGO BANK, N.A., and**
**THOMAS MARTIN**
        **Defendants.**

---

**DECISION AND ORDER**

Plaintiffs WisConn Investments, LLC, and Cherry Point Mall, LLC, (collectively, "Cherry Point"), brought this action against defendants Wells Fargo Bank, N.A. ("Wells Fargo") and Thomas Martin in Dane County Circuit Court, alleging breach of contract and related claims. Defendants timely removed, and the case was assigned to me after the available judges in the Western District recused themselves. I have jurisdiction because the amount in controversy exceeds $75,000, plaintiffs are limited liability companies whose members are all citizens of Wisconsin, defendant Thomas Martin is a citizen of Illinois and defendant Wells Fargo is a nationally-chartered bank having its main offices, as designated in its articles of association, in South Dakota. 28 U.S.C. §§ 1332 & 1348. Before me now is defendants' motion for summary judgment.

**I. BACKGROUND**

In 2007, Cherry Point sought long-term financing for the Cherry Point Mall, located in Sturgeon Bay, Wisconsin, which Cherry Point had previously purchased using short-term financing. Cherry Point hired a broker, Matthew Lund, to help obtain financing. Lund

contacted defendant Martin, a loan originator for Wells Fargo, and on behalf of Wells Fargo Martin expressed interest in making the loan. He anticipated that if Wells Fargo made the loan, it would sell it to a third party which would then package it with other loans and sell bonds secured by the loans.

On July 12, 2007, Cherry Point submitted a loan application to Wells Fargo along with a non-refundable processing fee of $15,500. The application stated that Cherry Point was organized for the sole purpose of owning the real property that secured the loan. It indicated that the loan would be non-recourse, meaning that if Cherry Point defaulted, Wells Fargo could foreclose on the property but not pursue Cherry Point's members. The application also stated that the loan amount would not exceed the lowest of four figures, including: (1) the amount requested by Cherry Point, $3.25 million, and (2) an amount equal to 75 percent of the appraised value of the property. The third and fourth figures would be calculated using an underwriting benchmark known as the debt service coverage ratio ("DSCR").

In commercial real estate, DSCR is a measure of a mortgaged property's ability to service a mortgage. See William B. Brueggeman & Jeffrey D. Fisher, Real Estate Finance & Investments 301, 344-45 (11th ed. 2001). It is principally based on the net operating income or cash flow generated by the property. A DSCR of less than 1.0 indicates that a property's cash flow is insufficient to cover its debt service payments; a DSCR of greater than 1.0 indicates that a property can pay its mortgage with income to spare. Generally, lenders like to see some cushion in the ratio so that if net operating income is less than anticipated the property will still be able to service its debt. A ratio of 1.2 is generally considered healthy. However, if the lender is satisfied that the borrower can cover its debt

2

through other income, it may make a loan even if the DSCR is less than 1.0.  In Cherry Point's case, the third loan-amount figure was whatever amount resulted in a DSCR of 1.2 using certain assumptions relating to the interest rate and amortization.  The fourth amount was whatever amount resulted in a DSCR of 0.91 using different assumptions relating to the interest rate and amortization.

Pursuant to a feature offered by Wells Fargo known as "Rate Lock," Cherry Point locked in a 6.5 percent interest rate prior to closing.  This meant that if Wells Fargo ultimately approved the loan, the interest rate would be 6.5 percent even if interest rates changed between the date of the lock and the date of the closing.  By guaranteeing this interest rate, Wells Fargo exposed itself to the risk that interest rates would rise before the loan closed and Wells Fargo securitized it, in which case the securitized loan would be worth less and Wells Fargo would incur a loss.   To enable Wells Fargo to offset such a loss, the application authorized it to utilize a hedge device of its choice. Wells Fargo chose a hedge device involving a swap contract.  (See generally Duffy Decl. & Dep.)  When Cherry Point locked the interest rate, Wells Fargo's trading desk entered into a swap contract with a counterparty in the market.  The value of the swap varied with market conditions, increasing as interest rates rose and decreasing as they fell.  If interest rates rose between the date of Cherry Point's rate-lock and the closing date, Wells Fargo would lose on its loan to Cherry Point but gain on its swap contract, and thus the gain on the swap contract would offset the loss on the loan. Conversely, if in the same period interest rates fell, Wells Fargo would lose on the swap contract but the value of the loan would increase, and the gain on the loan would offset the loss on the swap contract.

However, Wells Fargo could offset the swap loss only if the loan closed.  If interest rates fell but the loan did not close, Wells Fargo would suffer a loss on the swap contract that it could not offset.  To protect against this risk, Wells Fargo required Cherry Point to pay a "rate-lock deposit" to cover the swap losses that it would incur if interest rates fell but the loan did not close.  The initial deposit was $65,000 – 2 percent of the requested loan amount of $3.25 million.  However, the application provided that if market conditions caused the swap rate to drop while Wells Fargo evaluated the loan, thus exposing it to additional losses, Wells Fargo could require Cherry Point to increase its rate-lock deposit to provide additional protection to Wells Fargo if the loan failed to close.[1]  The application also stated that if Wells Fargo's swap losses exceeded the deposit, Cherry Point would be liable for the remainder.  If the loan closed, Wells Fargo would use the loan and swap contract to offset each other and would return the rate-lock deposit to Cherry Point as a credit on the closing statement.

While Cherry Point's loan was in the pipeline, market conditions caused swap rates to decline.  This, in turn, caused Wells Fargo to twice demand increases in Cherry Point's rate-lock deposit.  On October 17, 2007, Wells Fargo requested, and Cherry Point paid, an additional deposit of $40,625.  On October 30, 2007, Wells Fargo requested, and Cherry Point paid, an additional $66,625.  Thus, by November 2007, Cherry Point's rate-lock deposit totaled $172,250.

Meanwhile, Wells Fargo conducted a credit analysis to determine whether to make the loan.  It obtained an appraisal of the property, which disclosed an "as is" value of

---

[1] Specifically, the application authorized Wells Fargo to require Cherry Point to increase its deposit by 1 percent for each 20-basis-point decline in the swap rate.

4

$4,170,000 and a "stabilized" value of $4,360,000.  The as-is value supported a loan of $3,127,500 under Wells Fargo's 75 percent loan-to-value benchmark.  Cherry Point indicates that it would have been satisfied with a loan of this amount.  However, on October 10, 2007, Wells Fargo informed Cherry Point that in determining the amount of the loan, it would rely in part on guidelines set up by a company known as Centerline, a buyer of secured loans.  Wells Fargo further informed Cherry Point that it wanted the loan to comply with Centerline's guidelines so that it could sell the loan to Centerline or another packager of securities.

On October 29, 2007, by which time many lenders had raised interest rates on rate-locked deals because of credit market volatility, Lund asked Martin if Wells Fargo was "re-trading" deals, and Martin replied that it was "honoring all rate locked deals."  (Lund Dep. at 90 & 115.)  As I will discuss, the parties disagree about the meaning of Martin's statement.

On November 2, 2007, Wells Fargo advised Lund that it had concerns about Cherry Point's investors and about its anticipated income.  On November 7, 2007, it notified Lund that because of such concerns, it would not approve a loan in the amount requested.  On November 13, 2007, it indicated that based on its DSCR calculation and its analysis of Cherry Point's cash flow, it would loan Cherry Point no more than $2,375,000.  Cherry Point rejected this offer, concluding that the sum would not cover the existing, short-term mortgages on the property.

On November 16, 2007, Cherry Point demanded that Wells Fargo extend a loan in the amount originally requested or refund all deposits.  Wells Fargo interpreted this demand as a withdrawal of Cherry Point's loan application and accordingly terminated the

hedge, incurring a loss of $197,316 because of the decline in swap rates. It applied Cherry Point's rate-lock deposits to this amount and demanded that Cherry Point pay the remainder.

In the present action, Cherry Point seeks to recover the application processing fee and rate-lock deposits. Wells Fargo counterclaims, seeking $27,987.69, the difference between the loss it incurred in breaking the hedge and Cherry Point's deposits.

## II. DISCUSSION

I may grant summary judgment only when the materials before me demonstrate "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Miller v. Am. Airlines, Inc., 525 F.3d 520, 523 (7th Cir. 2008). In assessing defendants' motion, I must first attempt to understand Cherry Point's claims. Cherry Point does not argue that by accepting its application Wells Fargo agreed to loan it $3.25 million or any other amount. And in any case, the application was not a commitment to make a loan. (Application at p. 7 ¶ 5, & p. 8 ¶ 10.) Cherry Point alleges that Wells Fargo breached the implied duty of good faith and fair dealing but does not develop an argument supporting this claim. On page 10 of its brief, it mentions the duty perfunctorily but does not explain how Wells Fargo purportedly breached it and cites no caselaw. Thus, it waives any duty of good faith claim. See Harper v. Vigilant Ins. Co., 433 F.3d 521, 528 (7th Cir. 2005) (argument not properly presented to district court in response to motion for summary judgment is waived).

Cherry Point seems to make three arguments. First, it asserts that Wells Fargo did not actually enter into a hedge transaction to secure the loan's interest rate and that

6

therefore it suffered no loss when the loan failed to close.  Because Wells Fargo did not suffer a loss, argues Cherry Point, it had no right to retain the rate-lock deposit, and its retention of such deposit gives rise to a number of claims, including breach of contract, breach of fiduciary duty, conversion, theft and various forms of misrepresentation.  As I explain below, however, these claims fail because the premise on which they are based – that Wells Fargo did not actually enter into a hedge transaction or suffer actual losses – is unfounded.  Second, Cherry Point contends that the provisions in the loan application regarding the rate-lock deposit are unconscionable and therefore unenforceable.  As I also explain below, this claim fails because the provisions are not unconscionable.  Third, Cherry Point contends that in the course of evaluating its loan application, Wells Fargo committed a tort.  However, as I will discuss, the record does not support this assertion.

**A.**     **Wells Fargo's Hedge Transaction**

Cherry Point contends that Wells Fargo suffered no actual loss in connection with the hedge transaction associated with the rate lock and that it used the rate-lock deposit to cover "phantom losses."  (Br. in Opp'n at 12.)  However, Cherry Point presents no evidence that supports this contention.  As previously discussed, when interest rates decline and a rate-locked loan does not close, the bank is left with a swap contract that has declined in value, and it cannot offset the swap loss with a gain from the securitized loan.  (See generally Duffy Decl.)  This is an actual loss.  Cherry Point seems to argue that because Wells Fargo did not use its rate-lock deposit to purchase a specific swap contract but instead left the deposit in an account, it suffered no loss.  However, Wells Fargo's hedge did not involve using Cherry Point's deposit as purchase money for the swap

7

contract. A large bank such as Wells Fargo has its own trading desk that purchases securities and other instruments on the open market using its own funds. Cherry Point's rate-lock deposit was designed to be a security deposit that Wells Fargo could draw on if interest rates declined and the loan failed to close. Pursuant to the application, Cherry Point was ultimately liable for any hedge losses, and the deposit was to insure that it could cover such losses. If the loan closed and Wells Fargo suffered no loss, Wells Fargo would have returned the deposit as a credit on the closing statement. However, in the present case, the loan did not close and because interest rates declined significantly after Cherry Point locked the rate, Wells Fargo suffered a substantial loss. To offset the loss, it retained the deposit and pursued Cherry Point for the deficiency.

Cherry Point also seems to argue that Wells Fargo suffered no loss because it hedged on a portfolio basis. In mid-2007, Wells Fargo made a substantial number of loans every day. To minimize transaction costs, it conducted its hedge transactions in bulk, meaning that it hedged all the loans in its pipeline at once and did not have a specific swap contract that matched up to Cherry Point's loan. Thus, when it terminated Cherry Point's loan, it could not point to any specific swap contract that needed to be sold to close out of the hedge; rather, it calculated its losses using a formula representing the decline in the value of its swap portfolio. (<u>See</u> Duffy Decl. Ex. 2.) However, this does not mean, as Cherry Point suggests, that when the loan failed to close Wells Fargo suffered no actual loss. When Wells Fargo learned that Cherry Point's loan would not close, it put in an order to its trading desk to modify its portfolio by closing out whatever amount of swap contracts it held as a hedge against a rise in interest rates associated with Cherry Point's loan. It calculated the resulting loss in the value of the hedge portfolio based on the difference in

the swap rate on the date of the lock (i.e., the date on which it added swap contracts to its portfolio as a hedge against losses on Cherry Point's loan) and the date of termination of the rate-lock (i.e., the date on which it closed out the swap contracts because Cherry Point withdrew its application). (Duffy Decl. Ex. 2.) This is an actual loss. It is the rough equivalent of adding $100,000 worth of stocks to a portfolio and selling them for $95,000. The $5,000 difference in the value of the portfolio is an actual loss of $5,000. Thus, Cherry Point's contention that Wells Fargo suffered no losses when it broke the hedge is mistaken, and all claims based on such notion fail.

**B.     Unconscionability**

Cherry Point next claims that the rate-lock deposit provisions in Wells Fargo's loan application form are unconscionable. It further argues that I should evaluate this claim under California law, as the application provides. (Application at p. 4.) However, even if I apply the law that Cherry Point advocates, its unconscionability claim fails. California Civil Code § 1670.5(a) provides:

> If a court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

Under this provision, a clause in a contract is unenforceable only if it is both procedurally and substantively unconscionable. See, e.g., Circuit City Stores, Inc. v. Mantor, 335 F.3d 1101, 1105-06 (9th Cir. 2003). Procedural unconscionability focuses on the circumstances surrounding the formation of a contract, and it is sometimes found where no real negotiation occurred and a party made no meaningful choice. Id. at 1106. Substantive

9

unconscionability may be found when the terms of a contract are so one-sided and harsh as to shock the conscience. Id. at 1107. In determining substantive unconscionability, a court must evaluate a contract as of the time it was made. Id. Ultimately, unconscionability is question of law for court. See, e.g., Am. Software, Inc. v. Ali, 54 Cal. Rptr. 2d 477, 480 (Cal. Ct. App. 1996).

In the present case, nothing surrounding the formation of the loan application or the rate-lock deposit provision was even remotely untoward, and nothing in the application shocks the conscience. Wells Fargo did not require Cherry Point to lock the interest rate. Rather, Cherry Point chose to do so, having been informed by the application that it would bear the costs that Wells Fargo incurred if the loan did not close, even if the loan did not close because Wells Fargo decided against making the loan. (Application at p. 7 ("If the Rate is locked and [Wells Fargo] disapproves the loan for any reason" applicant shall be liable for any hedge losses) (emphasis added).) Cherry Point made a business judgment to lock the rate, apparently concluding that the benefit of the guaranteed rate outweighed the risk that if Wells Fargo disapproved the loan it would have to pay costs. Cherry Point likely regrets locking the rate. However, nothing in the record suggests that the application was procedurally or substantively unconscionable.

**C.    Tort Claims**

Finally, Cherry Point asserts "tort claims" that

> center on Defendant's [sic] inducement of the Plaintiffs to supply significant sums of money on the rate lock deposit at the same time it suggested the loan would be funded, first indirectly by promising the loan if there were no material changes and then directly [by] soliciting additional funds from the Plaintiffs knowing that the loan would not be funded.

(Pls.' Br. in Opp'n at 11.) The parties agree that Wisconsin law governs these claims. (Defs.' Br. in Supp. at 14-22; Pls.' Br. in Opp'n at 16.)

Rather than attempting to discern the precise tort theories on which Cherry Point relies,[2] I will explain why no reasonable jury could conclude that Wells Fargo committed a tort. Cherry Point first argues that Wells Fargo "promis[ed] the loan if there were no material changes." However, as discussed, the application stated in a number of places that it did not constitute a promise to make a loan. Further, even assuming that Wells Fargo promised to make a loan if there were no "material changes," the application provides that "material change" includes "newly discovered information concerning (a) the operation, performance, or condition . . . of the Property, the Applicant, any one or more of the key principals or owners of the Applicant, or any significant tenant at the Property." (Application at p. 7 ¶ 5.) Wells Fargo discovered a number of problems with the loan that meet this definition, including key principals' past bankruptcies and liquidity problems, vacancies, expiring leases and a less robust cash flow than anticipated. (See Defs.' Prop. Finding of Fact ¶ 63 (undisputed); Lund Dep. Exs. 80 & 84 (emails from Martin explaining

---

[2]Cherry Point does not precisely identify its tort legal theories. Although its manner of argument suggests that it means to assert misrepresentation claims, Cherry Point argues all of its tort claims under the heading "Breach of Fiduciary Duty." (Br. in Opp'n at 16-20.) However, Cherry Point has no plausible breach of fiduciary duty claim because defendants were not Cherry Point's fiduciaries. "A consistent facet of a fiduciary duty is the constraint on the fiduciary's discretion to act in his own self-interest . . . ." Zastrow v. Journal Communications, Inc., 291 Wis. 2d 426, 444 (2006). Nothing in the ordinary commercial relationship between a loan applicant and a bank constrains the bank's discretion to act in its own self-interest. Further, Wells Fargo's acceptance of Cherry Point's rate-lock deposit did not give rise to a fiduciary duty. As explained, Cherry Point knew when it made the deposit that Wells Fargo could retain it if for any reason the loan did not close and swap rates declined. Wells Fargo was not required to afford Cherry Point any special treatment simply because it accepted the deposit.

11

problems).) In light of these discoveries, Wells Fargo's decision to revise the terms of the loan does not give rise to a tort claim.[3]

Cherry Point's final argument is that Martin's statement that Wells Fargo was "honoring all rate locked deals" (Lund Dep. at 89-90, 108-09) constituted a representation that Wells Fargo would loan Cherry Point the amount requested. Cherry Point argues that Martin meant that Wells Fargo would loan it $3.25 million or something close to that amount. However, Cherry Point presents no evidence that would allow a reasonable jury to conclude that this was what Martin meant. Martin states in an uncontradicted declaration that he made this statement in response to Lund's inquiry as to whether Wells Fargo was re-trading deals due to volatility in the credit markets. (Martin Decl. ¶ 2.) Martin further states that by "honoring rate locked deals" he meant that if Cherry Point qualified for the loan, Wells Fargo would, in his opinion, honor the 6.5 percent interest rate rather than charge a higher interest rate as other banks were doing. Lund admits that his inquiry was whether Wells Fargo was re-trading deals and that he defined re-trading deals to mean "honoring the terms that they initially agreed to in the loan application." (Lund Dep. at 90.) He does not explain what he understood such terms to be, but the only term actually agreed to in the application was the interest rate. All other terms were subject to underwriting.

---

[3]I also note that to the extent the application was a commitment to make a loan in a specific amount (which, again, it was not) Wells Fargo seems to have honored the commitment. Specifically, Wells Fargo "promised" a loan in the amount of the lowest of four figures, two of which depended on a specific DSCR as measured using the property's cash flow. Ultimately, Wells Fargo offered Cherry Point a loan based on the property's cash flow and in accordance with the specified DSCR. This appears to have been the lowest of the four figures stated in the original application, and thus Wells Fargo offered Cherry Point a loan that met the terms of the application.

Lund does not submit a clarifying affidavit or other evidence suggesting that he was referring to something other than the interest rate. Nor does Cherry Point present expert testimony as to the meaning of re-trading deals in the commercial real estate industry. Thus, there is no evidence in the record that a statement about honoring deals in response to an inquiry about re-trading deals could reasonably be interpreted as a promise to make a loan of a certain amount. Finally, Lund himself states that he does not recall anyone telling him that Wells Fargo would make the loan.[4] (Lund Dep. at 91.) Accordingly, no reasonable jury could conclude that Martin told Cherry Point that Wells Fargo would loan it a certain amount, much less that he did so when he knew that it would not. Thus, Cherry Point's claims premised on this alleged misrepresentation fail.[5]

---

[4] Although Lund states that it was his "understanding" that Wells Fargo would make the loan, he also states that his understanding was based on nothing more than Wells Fargo agreeing to accept the loan application. (Lund Dep. at 91.) Cherry Point offers no evidence suggesting that in the commercial real estate industry it is reasonable to conclude that by accepting a loan application a bank has agreed to make the applied-for loan.

[5] I note that some of the evidence suggests that by October 29, 2007, Martin was aware that Wells Fargo's underwriting department had some problems with Cherry Point's loan. Martin did not inform Cherry Point about these problems before asking it to increase its rate-lock deposit for a second time. However, Cherry Point does not argue that Martin had a duty to disclose underwriting's concerns prior to asking for the additional deposit. That is, it does not cite the elements of a misrepresentation claim premised on a duty to disclose under Wisconsin law or argue that such elements are present here. See Kaloti Enters., Inc. v. Kellogg Sales Co., 283 Wis. 2d 555, 573-74 (2005) (listing elements of duty-to-disclose claim). Further, whether a duty to disclose exists is "an extremely complex" question of law, John Doe 1 v. Archdiocese of Milwaukee, 303 Wis. 2d 34, 67 (2007), and therefore I will not attempt to analyze whether it might be possible to cobble together a viable duty-to-disclose claim based on the present record. Instead, because Cherry Point does not develop any such argument in its brief, I consider it waived. Harper, 433 F.3d at 528.

**D.     Wells Fargo's Counterclaim**

The rate-lock provisions of the application provide that Wells Fargo is entitled to all costs associated with removing the hedge over and above the rate-lock deposit. Further, Wells Fargo submits uncontradicted evidence showing that its costs in excess of the deposit totaled $27,987.69. (Franchi Decl. ¶¶ 3-6 & Ex. 2.) Therefore, judgment will be entered in favor of Wells Fargo and against plaintiffs in the amount of $27,987.69.

### III.  CONCLUSION

For the reasons stated, **IT IS ORDERED** that defendants' motion for summary judgment is **GRANTED**. The clerk of court shall enter final judgment against plaintiffs on all claims and in favor of Wells Fargo on their counterclaim in the amount of $27,987.69.

Dated at Milwaukee, Wisconsin, this 22 day of June, 2009.

/s_____
LYNN ADELMAN
District Judge